Filed 9/10/14  P. v. Zamora CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERTO FERNANDEZ ZAMORA,<br><br>    Defendant and Appellant. | C073072<br><br>(Super. Ct. No. CRF120507) |

Appointed counsel for defendant Roberto Fernandez Zamora asks this court to review the record and determine whether there are any arguable issues on appeal. (*People v. Wende* (1979) 25 Cal.3d 436.)  Defendant filed a supplemental brief contending his trial counsel rendered ineffective assistance when she advised him "not to take any deals, and that's what [he] did" and requests his sentence be reversed.  We reject this contention.

Our review of the record has identified three errors that need to be addressed. First, the reporter's transcript omits the word "not" from the special jury instruction on flight.  This appears to be a clerical error.  But even if the word was omitted in the court's

1

reading, the written instruction is correct and we conclude it is not reasonably likely any juror misunderstood the instruction. Second, the trial court erroneously awarded defendant conduct credit pursuant to Penal Code section 4019.[1] The judgment must be modified to award conduct credit pursuant to section 2933.1. Third, the judgment must be modified to impose the mandatory criminal conviction assessment and court operations fee. As modified, the judgment is affirmed.

FACTS

A jury found defendant Roberto Fernandez Zamora guilty of eight counts of lewd and lascivious acts with a child under age 14. (§ 288, subd. (a).) He was sentenced to prison for 16 years, awarded 358 days' custody credit and 53 days' conduct credit, and ordered to pay a $240 restitution fine (§ 1202.4) and a $240 restitution fine suspended unless parole is revoked (§ 1202.45).

***Prosecution Case-in-Chief***

Y. was born in 1999 and was age 13 at the time of trial. In January 2012, she resided in Woodland with her 25-year-old sister and guardian, Jessica. Jessica's sons, J. age nine and A. age three, also resided there. A.'s father, J.M., stayed there temporarily as well. When J.M. was present, Y. would sleep in J.'s room, sometimes on the floor and sometimes in the bed.

Defendant is the brother of Jessica and Y. For a few weeks in January 2012, he resided with his siblings because his wife had evicted him from their residence. Y. had been on good terms with defendant and would talk to him about things that were bothering her or making her mad.

On multiple occasions during his stay, defendant rubbed Y.'s bare feet for a few seconds using both of his hands. The rubbing made Y. feel uncomfortable.

---

[1] Undesignated statutory references are to the Penal Code.

2

On one night during the stay, while Y. was falling asleep on the floor of J.'s room, defendant asked if he could sleep next to her because J., who was in the room, was flatulent. He lay down beside her and asked if he could put his arm around her. Then he grabbed her bare feet, put one foot on his penis, and rubbed the foot against the penis for a few seconds. The rubbing made her feel uncomfortable. She pulled her foot away.

The next thing Y. remembered was defendant pulling down her pajama bottoms and underwear and putting his penis in her vagina. She felt him move his penis back and forth several times. She also felt his hand squeezing her breast. She pushed him away using her elbow. Then he tried to get on top of her, but she pushed him away using her feet. Then he kissed her lips and said, "let me get a taste of you. You're so sexy."

Defendant told Y. "it takes two to make one mistake." She went downstairs and cried. He followed her, asked her to be his girlfriend, and suggested they move out of state with his wife. Defendant returned to his room and Y. spent the remainder of the evening downstairs.

A few days or weeks later, while Y. was sleeping on the floor of J.'s room, she was awakened from sleep by defendant rubbing her foot against his penis. He stopped when she pulled her foot away. Then he pulled down her pajama bottoms and underwear to the knees. Y., lying on her stomach, felt defendant licking between her butt cheeks and softly biting her butt. Then he stopped but she did not know why.

Y. retrieved one of J.'s socks, used it to wipe saliva off of herself, and put the sock under the bed. Then defendant started rubbing Y.'s feet as he always had. She bent her knees toward her stomach and he stopped rubbing her feet. Then he mumbled something about the devil telling him to do this. Y. went to Jessica's room and slept on the floor.

The next morning, defendant left the residence. Y. told Jessica defendant had been touching her inappropriately and proceeded to tell her everything that had occurred. Y. had not told Jessica earlier about the first incident because defendant had said it could

3

"stay between" the two of them. Jessica recollected Y. disclosed the details in a series of conversations over a period of days.

Jessica tracked down defendant and confronted him. He denied Y.'s accusations and said he should have told Jessica sooner that Y. had attempted to grab his penis. He asked her to not do it again and did not report the matter to Jessica.

Jessica returned to Y., who denied attempting to make contact with defendant's penis. Jessica took Y. to a police station but it was closed for the weekend. They proceeded to a hospital where they were met by their brother Jose. As the trio conversed, Y. mentioned the sock, which she had forgotten to include in earlier conversations. Y. retrieved the sock. Jessica put it in a plastic bag and gave it to a police officer.

Jessica and Jose proceeded to Jose's residence where they confronted defendant. She gave him her "word as a woman" she would not report him to the police if he told her what had happened. Jose told defendant a few times it was "safe" to admit he had done it because no one would report it to the police. Defendant continued to deny the allegations for four to five hours. Jessica threatened to call the police. Jose suggested the police might still find DNA on Y. Defendant said he and Y. had "a boyfriend/girlfriend type thing going on." According to Jessica, defendant admitted he "barely" inserted his penis in Y. According to Jose, defendant admitted he rubbed his penis on Y.

After Jessica left, defendant told Jose he did not do it. Jose had never seen defendant in such an emotional state.

Jessica's father told her not to report the offenses to the police. Jessica said the only circumstances under which she would not report it were if she and Y. did not have to see defendant. After a telephone call was made to the grandmother in Mexico, Jessica and her father spoke with defendant about leaving the country. Defendant said he planned to move to San Diego but needed more time. Jessica gave him three or four days.

4

Jessica had a long-standing bad relationship with her mother. Jessica confronted her mother because her mother did not believe Y.'s allegations. Following the confrontation, Jessica reported the incident to the police. The police spoke to Y., and Jessica gave the sock to the police.

Y. told an interviewing police officer defendant had put his penis in her vagina. Y. described a second incident in which defendant removed her clothing, kissed her neck and back, bit her bottom, and her feet touched his penis.

The crime laboratory analyzed the sock Y. assertedly had used to wipe saliva from her buttocks. There were no sperm cells. But there were other cells that included the DNA of at least two people. The analyst was able to exclude Jessica, J.M., and the children, J. and A., as contributors. The analyst was not able to exclude Y. or defendant. The probability that a random unrelated individual could have contributed to the DNA sample was exceedingly small.

On February 9, 2012, defendant voluntarily appeared at the Woodland Police Department and made a statement. Defendant was told he was free to leave and did not have to make any statements. Defendant said he was there because of "false accusations." Defendant said he and Jessica never got along. Jessica threatened to "bring [him] down" or, if that did not happen, she would have nine-year-old J.'s father, who was "involved with the mafia," kill him.

Defendant stated that during the first incident, Y. tried to put her foot on his privates but he moved. Defendant said that during the second incident, he hugged Y. because she had been upset. At some point following the hug, defendant believed Y. was trying to touch his privates. He asked her what her problem was, and she started to cry. He told her what she had done was "wrong on every level." He said he was sorry if his hugging her had given her the wrong idea.

5

Defendant stated Y. went to Jessica and "swap[ped] the whole thing," claiming defendant was trying to touch Y. In turn, Jessica confronted defendant and asked him what had happened. Jessica said Y. had claimed defendant had tried to touch her "boobie." Defendant told Jessica what had happened but she did not believe him. Jessica told defendant J.'s father would be waiting for him in prison and he would be raped and killed. As a result, defendant admitted he had kissed Y.'s back. In order to make Jessica happy, defendant told her he had put his penis between Y.'s legs; however, "none of that happened."

A detective told defendant the police had a sock. Defendant said his DNA would not be on the sock. But he drools when he sleeps, and Jessica admitted to him she had gathered his saliva. If the officers located saliva, it had been gathered from his pillow.

The detective suggested Y., who appeared to be older than age 12, might have manipulated defendant into doing something he normally would not do. Defendant adamantly denied it.

The detective also suggested the conduct was consensual. Defendant continued to maintain he was innocent. Defendant said he hugged Y., she stretched out her legs, and he moved. He saw her butt coming towards him, trying to touch him. He told her, "that's not right." Y. started crying and stated defendant was going to tell Jessica. Defendant responded that he would not tell Jessica.

### Defense

The defense rested without presenting evidence or testimony.

## DISCUSSION

## I

### Ineffective Assistance of Trial Counsel

Defendant contends his trial counsel rendered ineffective assistance when she told him he "had a good chance of beating" the charges at "[his] trial" and thus advised him

6

"not to take any deals, and that's what [he] did." Defendant took trial counsel at "her word because [he] truly believed that she knew best." Defendant states he "would like to get the last deal that was offered," a prison sentence of "4 years," although he notes the prosecutor "was also considering" a deal of "3 years with 1 charge." It appears defendant is seeking the last plea offered because he was sentenced to serve a longer term after trial and the last plea was the shortest term.

The record on appeal sheds no light on why trial counsel rendered the advice to not accept the pleas. Trial counsel was not asked for an explanation, and the record does not suggest there simply could be no satisfactory explanation. Under these circumstances, the claim of ineffective assistance on appeal must be rejected. "A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

## II

### *Special Jury Instruction on Flight*

Our review of the record indicates the jury received a special instruction on flight. The written instruction stated in relevant part: "A defendant's flight immediately after a crime may tend to establish a consciousness of guilt but this is not sufficient in itself to establish guilt. However, on the other hand, the fact that a defendant did not flee when he had the opportunity to do so may tend to show that the defendant did *not* have a consciousness of guilt." (Italics added.)

In the reporter's transcript, the italicized word "not" has been omitted. No contemporaneous objection occurred. In summation, defense counsel argued, "there's actually an instruction that you'll have a chance to read that talks about absence of flight. In a case when someone is accused of a crime and they run, where they're in a place where the crime's just occurred and they're running away, you can consider that. You can also consider the fact that someone chooses to stay and chooses to face these

7

accusations." Defense counsel went on to argue, "[t]his is staying, and this is volunteering yourself for this prosecution. So please consider that. It's in the instructions, and I think it's very important."

Under these circumstances, the omission of the word "not" from the reporter's transcript appears to be a clerical error. Alternatively, if the word was not spoken, the omission was inadvertent and the written instruction was correct. We conclude it is not reasonably likely any juror understood the instruction in an erroneous manner. (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526; *People v. Clair* (1992) 2 Cal.4th 629, 663.)

## III

### *Conduct Credit and Mandatory Fees*

Our review of the record indicates there is an error in the award of conduct credit. The clerk's minutes and the abstract of judgment purport to award conduct credit pursuant to section 4019. Because defendant's offenses are serious felonies, his conduct credit must be awarded pursuant to section 2933.1.

We also note the trial court did not impose the mandatory criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)) of $240 ($30 per conviction) or the mandatory court operations fee (§ 1465.8) of $320 ($40 per conviction) the probation department had recommended.

We modify the judgment to reflect conduct credit pursuant to section 2933.1 and impose the mandatory criminal conviction assessment and court operations fee.

Having undertaken an examination of the entire record, we find no arguable error that would result in a disposition more favorable to defendant.

## DISPOSITION

The judgment is modified to award defendant 53 days' conduct credit pursuant to Penal Code section 2933.1 and to impose a $240 criminal conviction assessment and a $320 court operations fee. As so modified, the judgment is affirmed. The trial court is

directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


      HOCH     , J.


We concur:


     RAYE    , P. J.


    BLEASE   , J.

9